IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALFIE CARTER,

      Plaintiff,

      v.                                       Case No. 20-2093-DDC

UNION PACIFIC RAILROAD COMPANY,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff Alfie Carter worked for defendant Union Pacific Railroad Company as a Yardman. This position required plaintiff to operate trains and move them in the railyard safely and efficiently. After plaintiff sustained a head injury in a motorcycle accident, defendant placed plaintiff on medical leave and required him to undergo a fitness-for-duty evaluation. From that evaluation, defendant determined that plaintiff's head injury presented a risk of seizure and sudden incapacitation. And so, defendant imposed certain work restrictions on plaintiff lasting for five years. After reviewing the restrictions, plaintiff's supervisor determined that defendant couldn't provide a reasonable accommodation for plaintiff's restrictions because the restrictions interfered with the essential functions of the Yardman position. So, defendant informed plaintiff it was unable to identify a reasonable accommodation that would permit him to return to work safely in his position as Yardman.

These facts give rise to the employment discrimination claims plaintiff asserts in this lawsuit. Plaintiff brings three claims against defendant: (1) disability discrimination violating the Americans with Disabilities Act as Amended (ADAAA),[1] 42 U.S.C. §§ 12101–12213,

---

[1]     The Pretrial Order asserts that plaintiff brings a claim under "the Americans with Disabilities Act of 1990 ('ADA'), 42 U.S.C. § 12112 et seq." Doc. 58 at 2 (Pretrial Order ¶ 1.d.). The court construes the

(2) retaliation violating the ADAAA, and (3) retaliation violating the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654.  Defendant has filed a Motion for Summary Judgment against all of plaintiff's claims.  For reasons explained below, the court grants defendant's motion (Doc. 59).

## I.      Uncontroverted Facts

The following facts either are stipulated in the Pretrial Order (Doc. 58), uncontroverted, or where genuinely controverted, viewed in the light most favorable to plaintiff—the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

### *Defendant Union Pacific Railroad Company*

Defendant operates an interstate Class I freight railroad that links 23 states in the western two-thirds of the United States by rail.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.1.).  Defendant is headquartered in Omaha, Nebraska, and it employs more than 30,000 employees.  *Id.* at 2 (Pretrial Order ¶ 2.a.2.).  Defendant has an Equal Employment Opportunity and Affirmative Action Policy that prohibits discrimination, retaliation, and harassment.  Doc. 60-1 (EEO Policy).  Also, the Policy provides information about how to request leave under the FMLA and how to request a reasonable accommodation under the ADA.  *Id.*  Plaintiff knew that defendant had an Equal Employment Opportunity Policy prohibiting discrimination and harassment based on disability.  Doc. 60-2 at 23–24 (Pl.'s Dep. 92:24–93:10).

### *Plaintiff's Employment with Defendant*

Plaintiff began working for defendant in 2005.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.3.).  He was hired as a Thru Freight Brakeman working in Kansas City, Missouri.  *Id.*; *see also* Doc. 60-2

---

action as one under the ADA, as amended by the ADA Amendments Act of 2008 (ADAAA), and relies on that governing version of the ADA when ruling the pending motion.  *See Skerce v. Torgeson Elec. Co.*, 852 F. App'x 357, 361–62 (10th Cir. 2021) (discussing *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016)).

at 15 (Pl.'s Dep. 58:11–15).  When plaintiff worked for defendant, he was a union member and

the terms and conditions of his employment were set by a collective bargaining agreement.

(CBA).  Doc. 60-2 at 18 (Pl.'s Dep. 69:18–70:4).

On November 1, 2015, plaintiff began working as a Yardman in Kansas City, Missouri.

Doc. 58 at 2 (Pretrial Order ¶ 2.a.4.).  Yardman is a safety-critical position.  Doc. 60-3 at 1

(Curtis Decl. ¶ 7).  As a Yardman, plaintiff was responsible for the safe and efficient movement

of trains in the yard.  Doc. 60-2 at 16 (Pl.'s Dep. 62:19–63:16).  One of his job duties was

making sure trains were on the right tracks and moving safely.  *Id.*  It was critical that plaintiff

performed his job in a manner that assured the safety and health of his coworkers, the public, and

himself, especially because he was operating engines weighing about 325,000 pounds and

locomotives with hazardous materials.  *Id.*; *see also* Doc. 60-3 at 1 (Curtis Decl. ¶ 7).

The essential functions of the Yardman position included that the Yardman "(1) assure

safe, on-time [and] on-plan train operation and movement; (2) perform switching operations for

on-time [and] on-plan car routing, delivery and pickup; (3) conduct train and equipment

inspections; (4) communicate and report information concerning train movements and work

orders; (5) interpret and assure compliance with signals; (6) practice safe work habits; and (7)

assure compliance with [defendant] and Federal rules, general orders and instructions."  Doc. 60-

4 (Job Description); *see also* Doc. 60-3 at 1 (Curtis Decl. ¶ 6).  One of the essential functions of

the Yardman position was operating and controlling the movement of defendant's locomotives

by remote control.  Doc. 60-4 (Job Description); *see also* Doc. 60-3 at 2 (Curtis Decl. ¶ 8).  The

position requires a Yardman to remain aware of his surroundings at all times, fully concentrating

and focused on what he is doing.  Doc. 60-3 at 2 (Curtis Decl. ¶ 8).  This job function is

important to providing safe rail travel for defendant's employees, as well as the general public.

3

*Id.*  It is essential for the Yardman to have the ability to take appropriate action when conditions threaten the safety and health of the employee, coworkers, or the general public.  *Id.*  As a consequence, the Yardman must have good concentration, focus, alertness, insight, judgment, and impulse control when performing the job.  *Id.*

As a Yardman, plaintiff operated a locomotive remotely by controlling the engine, speed, direction, brakes, horn, and headlights as it traveled between yards in the Kansas City metro area.  Doc. 60-2 at 16 (Pl.'s Dep. 61:4–62:11).  Operating a locomotive by remote control means that plaintiff was not in the locomotive's cab and, thus, he couldn't see what was directly in front of him.  Doc. 60-3 at 2 (Curtis Decl. ¶ 8).  The job duty of operating a locomotive by remote control poses danger and risk of injury or death to the general public.  *Id.*  Also, as a Yardman, plaintiff was required to understand both federal and defendant's safety rules, practices, and procedures.  Doc. 60-2 at 16 (Pl.'s Dep. 64:3–9); Doc. 60-3 at 1 (Curtis Decl. ¶ 7).

### Plaintiff's Medical History

Plaintiff has Type II Diabetes.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.5.).  Plaintiff takes Metformin and Glipizide daily to control his blood sugar levels.  Doc. 60-5 at 1 (August 21, 2018 Letter).  Plaintiff doesn't take insulin or any other injectable medication to control his diabetes. *Id.*

### Plaintiff's Motorcycle Accident

On July 15, 2018, plaintiff was involved in a motorcycle accident.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.6.).  Plaintiff was wearing a helmet during the accident.  *Id.* (Pretrial Order ¶ 2.a.8.). The accident occurred when plaintiff's bike fell down to the ground sideways.  Doc. 60-2 at 6 (Pl.'s Dep. 23:12–24:10).  Plaintiff came off the bike, and he hit his head.  *Id.*  Plaintiff lost consciousness for about five minutes.  *Id.* (Pl.'s Dep. 24:11–20); *see also* Doc. 63-5 at 24

4

(Rosenberg Dep. 30:1–10) (noting that plaintiff lost consciousness for less than 30 minutes).  He was transported by ambulance from the accident scene to a hospital.  Doc. 60-2 at 6–7 (Pl.'s Dep. 24:13–25:2).  Plaintiff sustained three broken ribs in the accident.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.7.).  Also, a CT scan of plaintiff's brain showed a subcortical hemorrhage in the anterior superior frontal lobe about 1.5 centimeters in size.  Doc. 60-6 (July 15, 2018 CT Scan Report).  The attending neurosurgeon, Dr. William Rosenberg, confirmed there was a subcortical hemorrhage in the anterior superior frontal lobe of plaintiff's brain and recommended a follow-up CT scan for the next morning.  *Id.* at 3.  Dr. Rosenberg's initial role in treating plaintiff was to assess whether plaintiff would require neurosurgery.  Doc. 60-7 at 3 (Rosenberg Dep. 11:16–12:1).

On July 16, 2018, plaintiff had a second CT scan.  Doc. 60-8 (July 16, 2018 CT Scan Report).  The second CT scan showed the size of the hemorrhage had increased overnight.  *Id.* at 7.  And, the CT scan showed that the hemorrhage was consistent with a shear type injury.  *Id.* Dr. Rosenberg reviewed the CT scan and decided the hemorrhage's larger size did "not represent a clinically significant finding" because neurosurgery was not necessary.  Doc. 60-7 at 4 (Rosenberg Dep. 13:15–14:25).

On July 18, 2018, plaintiff was discharged from the hospital.  Doc. 58 at 2 (Pretrial Order ¶ 2.a.9.).  Dr. Rosenberg recommended that plaintiff schedule a follow up appointment in one month for a third CT scan.  Doc. 60-9 at 6 (July 17, 2018 Report).

### *Plaintiff's Treatment from Dr. Richardson*

On July 20, 2018, plaintiff had a follow up appointment with his then primary-care physician, Dr. Sequita Richardson.  Doc. 60-11 (July 20, 2018 Report); Doc. 60-10 at 2–3 (Richardson Dep. 8:25–9:10, 10:6–19).  His discharge diagnoses from the hospital included:  a

head injury with concussion, intraparenchymal hemorrhage of the brain, and an intracranial contusion (bruising of the brain); three fractured ribs; and alcohol intoxication. Doc. 60-11 at 1. For the head injury, Dr. Richardson instructed plaintiff to keep his follow-up appointment with neurology. *Id.* at 3; *see also* Doc. 60-10 at 3 (Richardson Dep. 12:1–19). Beyond pain management, there was no additional treatment for plaintiff's fractured ribs because those can heal on their own. Doc. 60-10 at 4 (Richardson Dep. 13:4–8).

Dr. Richardson is not a neurologist and does not specialize in treating diseases of the brain. *Id.* at 3 (Richardson Dep. 9:25–10:5, 12:1–22). Dr. Richardson testified that she was not the treating physician for plaintiff's head injury. *Id.* (Richardson Dep. 12:20–22).

On July 24, 2018, Dr. Richardson prepared a note releasing plaintiff to return to light duty work on August 1, 2018. Doc. 60-12 (July 24, 2018 Note). The note restricted plaintiff from lifting 15 pounds because of the pain he was feeling in his ribs and stated that he could return to regular duty on September 1, 2018. *Id.*; *see also* Doc. 60-10 at 4 (Richardson Dep. 14:17–16:11). When Dr. Richardson prepared the note, she considered plaintiff's pain levels, how quickly the pain medication would start to work, his need to start physical therapy, and the timing of his follow-up appointment with the neurologist. Doc. 60-10 at 4 (Richardson Dep. 15:8–16:11). Also, when Dr. Richardson prepared the note, she knew that plaintiff worked for defendant in the Yard. *Id.* at 4–5 (Richardson Dep. 16:12–18:16). But, she wasn't familiar with his job. *Id.* She didn't know the job's purpose or the position's essential functions. *Id.* She had not reviewed defendant's job description for the position. *Id.* Also, she had no experience in the railroad industry, had never seen the job performed, and didn't know that the position was a safety-critical position.[2] *Id.*

---

[2] Also, Dr. Richardson testified that she didn't know that plaintiff was responsible for driving trains via remote control operation. Doc. 60-10 at 5 (Richardson Dep. 18:6–9). Plaintiff controverts this fact,

When Dr. Richardson prepared the note dated July 24, 2018, she hadn't conducted an assessment to determine whether plaintiff was at risk for seizures.  *Id.* at 5 (Richardson Dep. 19:1–9).  Also, she didn't consider the risk he would pose to himself, his coworkers, or the public if he were to have a seizure while working in his job.  *Id.*  Before Dr. Richardson prepared the note releasing plaintiff to return to work, she did not consult any guidance from the Federal Motor Carrier Safety Administration and does not recall consulting any other medical literature. *Id.* (Richardson Dep. 19:10–20:1).

### Plaintiff's Follow-Up CT Scan

On August 3, 2018, plaintiff had a third CT scan.  Doc. 60-13 (August 3, 2018 Report). The CT scan revealed the hemorrhage had resolved itself.  *Id.* at 1.  On August 22, 2018, plaintiff had a follow-up appointment at Dr. Rosenberg's office with clinical nurse specialist (CNS) Laura Textor.  Doc. 60-14 (August 22, 2018 Report).  Dr. Rosenberg did not visit with plaintiff during this appointment.  Doc. 60-7 at 5 (Rosenberg Dep. 17:13–19:9).  CNS Textor told plaintiff that the hemorrhage had resolved but she would confirm the CT scan results with Dr. Rosenberg. Doc. 60-14 at 2 (August 22, 2018 Report).  Also, CNS Textor noted that plaintiff was experiencing lightheadedness, dizziness, and problems with short-term memory.  *Id.* at 1.

### More Treatment From Dr. Richardson

On August 28, 2018, Dr. Richardson saw plaintiff for a follow-up visit.  Doc. 60-15 (August 22, 2018 Report).  Dr. Richardson's records note that plaintiff was experiencing "some symptoms of the concussion."  *Id.* at 1.  He reported that he had to stand up slower because he was getting lightheaded, but his memory was better.  *Id.*  He reported that he was not having

---

asserting that he told Dr. Richardson that he operated trains by remote control.  Doc. 60-2 at 44 (Pl.'s Dep. 173:21–174:11).  But, even if plaintiff told Dr. Richardson about this one job duty, it doesn't controvert Dr. Richardson's testimony that she didn't know the essential functions of plaintiff's job, never reviewed the job description, and didn't know about the safety-critical nature of the position.

much pain, except some issues with his ribs while sleeping.  *Id.*  For plaintiff's concussion, Dr. Richardson's examination showed that plaintiff continued to improve.  *Id.* at 3.  Dr. Richardson noted that plaintiff's most recent head CT scan was negative for bleeding.  *Id.*  Also, plaintiff's rib fractures were healing and did not need any further treatment.  *Id.*; *see also* Doc. 60-10 at 6 (Richardson Dep. 23:19–21).

Dr. Richardson released plaintiff to return to work without restriction on September 1, 2018.  Doc. 60-16 (August 28, 2018 Note).  When Dr. Richardson released plaintiff to return to work, she still wasn't familiar with essential job functions of plaintiff's job or its safety-critical nature.  Doc. 60-10 at 6–7 (Richardson Dep. 24:15–25:19).  Also, Dr. Richardson testified that she hadn't conducted an assessment to determine if plaintiff was at risk for seizures or whether his risk for future seizures would affect his ability to perform the essential functions of his job safely.  *Id.*  But, Dr. Richardson testified that she personally consults with patients when issuing a return to work letter.  Doc. 63-7 at 9 (Richardson Dep. 15:8–17).  She asks patients what their work involves, and she asks about their pain levels and the medications they are taking.  *Id.*  For plaintiff, Dr. Richardson testified that she "took into consideration that he would be following [up] with" the neurologist when she prepared his return to work letter.  *Id.* at 9–10 (Richardson Dep. 15:8–16:3).

Also, Dr. Richardson performed a "mini mental status examination," a neurologic examination, and a physical examination.  *Id.* at 15–16 (Richardson Dep. 22:3–15, 22:24–23:11).  The mini mental status examination asked plaintiff a series of questions designed to assess his immediate reset and remote memory.  *Id.* at 15 (Richardson Dep. 22:10–15).  The questions included asking plaintiff to solve math problems, repeat words, draw objects, and write sentences.  *Id.* (Richardson Dep. 22:16–23).  The neurologic examination examined plaintiff's

8

cranial nerves by testing his tender reflexes, strength, and coordination. *Id.* at 15–16 (Richardson Dep. 22:24–23:4). The physical examination involved examining plaintiff's general physical condition, including his mouth, neck, heart, lungs, and extremities. *Id.* at 16 (Richardson Dep. 23:5–11). Dr. Richardson also considered plaintiff's most recent CT scan which was negative for bleeding. *Id.* (Richardson Dep. 23:16–18). She noted no evidence of a brain hemorrhage or contusion on his CT scan. *Id.* at 21 (Richardson Dep. 28:21–25).

Dr. Richardson never imposed a driving restriction on plaintiff. *Id.* at 27–28 (Richardson Dep. 35:17–36:16). Also, she testified that she didn't believe plaintiff posed a more significant risk while driving than he did before the accident occurred. *Id.* at 28 (Richardson Dep. 36:17–21). Dr. Richardson never diagnosed plaintiff as having had a seizure or being at risk of having a seizure or stroke in the future. *Id.* at 29 (Richardson Dep. 37:7–21).

On August 31, 2018, Dr. Richardson prepared a third note releasing plaintiff to return to work on September 4, 2018. Doc. 60-17 (August 31, 2018 Note). Dr. Richardson prepared the third note after plaintiff asked for a more detailed return-to-work note. Doc. 60-10 at 7 (Richardson Dep. 25:24–26:14); Doc. 60-18 (August 31, 2018 Report). When Dr. Richardson completed the note on August 31, 2018, she still had no familiarity with plaintiff's essential job functions or the job's safety-critical nature. Doc. 60-10 at 8 (Richardson Dep. 30:6–31:14). Also, Dr. Richardson testified that she had not assessed whether plaintiff was at risk for seizures or whether his risk for future seizures would affect his ability to perform the essential functions of his job safely. *Id.*

### *Follow-Up with Dr. Rosenberg*

On September 4, 2018, CNS Textor called plaintiff and told him that Dr. Rosenberg had reviewed the most recent CT scan and confirmed that there was no evidence of blood. Doc. 60-

19 (September 4, 2018 Report); *see also* Doc. 63-5 at 12 (Rosenberg Dep. 17:2–12).  Plaintiff

was released from neurological surgery surveillance, and no further follow-up was needed.  Doc.

60-19 (September 4, 2018 Report); *see also* Doc. 63-5 at 14–15 (Rosenberg Dep. 19:14–20:1).

Dr. Rosenberg never warned plaintiff that he was at risk of having a seizure.  Doc. 63-5 at 20

(Rosenberg Dep. 26:12–18).  He never contacted any authority—like a driver's license agency—

to advise that plaintiff was at an increased risk of seizure.  *Id.* at 21 (Rosenberg Dep. 27:4–11).

       Dr. Rosenberg evaluated plaintiff on the Glasgow Coma Scale (GCS)—a test identifying

the level of neurological function in trauma patients.  *Id.* at 21–22 (Rosenberg Dep. 27:17–28:2).

The GCS test evaluates the patient's awareness, pupillary response, eyes, and movement.  *Id.*

Dr. Rosenberg testified that plaintiff's GCS results were normal.  *Id.* at 22 (Rosenberg Dep.

28:14–22).  Also, Dr. Rosenberg testified, he never told plaintiff that he was at risk of having a

stroke because he wasn't aware of any reason to give such a warning.  *Id.* at 23 (Rosenberg Dep.

29:16–25).

       Dr. Rosenberg never provided plaintiff with a release to return to work for his job with

defendant.  Doc. 60-7 at 5 (Rosenberg Dep. 20:11–17).  Nor did Dr. Rosenberg conduct any

assessment about plaintiff's ability to return to work with defendant.  *Id.*  Dr. Rosenberg testified

that he wasn't familiar with plaintiff's position as a Yardman.  *Id.* at 5–6 (Rosenberg Dep. 20:18

–21:23).  Also, Dr. Rosenberg didn't have any knowledge of the railroad industry or the safety-

critical nature of the position.[3]  *Id.*

---

[3]      Plaintiff tries to controvert this fact, asserting that he told Dr. Rosenberg that he operated trains
by remote control.  Doc. 60-2 at 44 (Pl.'s Dep. 173:21–174:11).  But, plaintiff's testimony doesn't
controvert the fact that Dr. Rosenberg testified that he didn't have any knowledge of the requirements or
essential functions of plaintiff's position.

*Defendant Places Plaintiff on Medical Leave and Starts FFD Evaluation*

After the hospital discharged plaintiff, he called defendant's nurse in Kansas City.  Doc. 60-2 at 22 (Pl.'s Dep. 85:1–87:15).  Plaintiff informed the nurse that he was involved in a motorcycle accident.  *Id.*  He reported that he broke his ribs and probably needed some light duty until his ribs healed.  *Id.*  Also, plaintiff told the nurse that he hit his head and was "knocked out."  *Id.*  According to plaintiff, the nurse said, "that might be a problem" and she needed to "make some phone calls."  *Id.*

On July 16, 2018, defendant gave plaintiff a Notice of Rights and Responsibilities under the FMLA.  Doc. 60-21.  This Notice provided:

1.  To initiate the FMLA process you may submit a request through the eHealthSafe portal or contact the HR Service Center at [a number provided].

2.  If you choose not to request FMLA or if certification is not provided or does not substantiate your eligibility for leave as defined by the FMLA, any absences taken in relation to your leave will not be protected under FMLA regulations.

3.  Approval of your request for a UPRR medical leave does not guarantee coverage under the FMLA.  You must apply separately for FMLA.  Likewise, the status of your FMLA application does not affect the approval of your UPRR medical leave request.

4.  FMLA leave will be counted against your annual FMLA leave entitlement. Employees have 12 workweeks or the equivalent of 12 workweeks of FMLA leave available on an annual basis.

*Id.*  Plaintiff doesn't recall submitting a request to take FMLA leave after his motorcycle accident.[4]  Doc. 60-2 at 30 (Pl.'s Dep. 118:3–24).

On July 26, 2018, defendant's Health & Medical Services (HMS) department placed plaintiff on a medical leave of absence from July 17, 2018 through August 17, 2018.  Doc. 60-22

---

[4]      Plaintiff testified that he "was granted FMLA."  Doc. 60-2 at 30 (Pl.'s Dep. 118:16–20).  But also, he testified that he can't remember what he applied for.  *Id.*  And, plaintiff agreed, his reference to a grant of "FMLA" was referring to defendant granting him "medical leave."  *Id.* (Pl.'s Dep. 118:21–24).

(July 26, 2018 Letter).  Defendant notified plaintiff that defendant's medical rules required him to undergo a fitness-for-duty (FFD) evaluation before returning to work.  *Id.* at 1.  And, defendant asked plaintiff to provide certain medical information about his absence.  *Id.*

On August 22, 2018, defendant extended plaintiff's medical leave of absence to October 17, 2018, to give HMS additional time to complete the FFD evaluation.  Doc. 60-24 (August 22, 2018 Letter).

HMS conducts a FFD evaluation when there are legitimate concerns about an employee's ability to perform essential functions of his job safely.  Doc. 60-25 (Defendant's Medical Rules); *see also* Doc. 60-26 at 1 (Holland Decl. ¶ 4); *see also* Doc. 63-4 at 71–72 (Holland Dep. 81:23 – 82:22) (testifying that an employee with a "reportable health condition" must report the condition and may have to undergo a FFD evaluation to determine whether the condition poses a potential safety risk).  The FFD evaluation focuses on safety risks in the railroad environment associated with the employee's specific health condition and job duties.  Doc. 60-26 at 1 (Holland Decl. ¶ 4).  In connection with the FFD evaluation, HMS asks the employee to gather medical records relevant to the employee's ability to perform his job duties safely.  *Id.*; *see also* Doc. 60-25 at 2 (Defendant's Medical Rules).

Defendant's Chief Medical Officer testified that plaintiff was required to undergo a FFD evaluation because he had lost consciousness after his motorcycle accident, and so, HMS needed to determine whether plaintiff safely could perform his safety-critical job.  Doc. 60-23 at 52–53, 81–83, 132–33 (Holland Dep. 52:18–53:11, 81:20–83:2, 132:1–133:3).

In 2011, defendant began to reexamine its FFD evaluation process for its employees in safety-critical jobs.  Doc. 60-26 at 1 (Holland Decl. ¶ 5).  According to defendant's Chief Medical Officer, this reexamination was prompted in part by repeated recommendations from the

National Transportation Safety Board (NTSB) to both the Federal Railroad Administration (FRA) and individual railroads (including defendant), to adopt comprehensive medical standards and enhanced fitness-for-duty requirements for employees in safety-critical positions, as well as FRA's failure to adopt any such standards or requirements.[5]  *Id.* at 2 (Holland Decl. ¶ 6).  In 2006, the FRA initiated, within its Railroad Safety Advisory Committee (RSAC), a Medical Standards Working Group.  *Id.* (Holland Decl. ¶ 7).  The Working Group was charged to recommend medical standards and procedures for determining medical fitness-for-duty for railroad workers in safety-critical positions (*i.e.*, those whose work activities or work settings posed an inherent risk of significant physical harm to themselves or others).  *Id.* (Holland Decl. ¶ 7).  Despite the Working Group's recommendations, the FRA didn't adopt any new regulations incorporating comprehensive medical standards and fitness-for-duty requirements for railroad workers in safety-critical positions.  *Id.* (Holland Decl. ¶ 9).

In late 2011, responding to the FRA's failure and influenced by the NTSB's recommendations from railroad accident reports, HMS changed the criteria governing defendant's evaluation of a person's fitness-for-duty for a safety-critical position when he had presented a condition that may present a risk of sudden incapacitation.  *Id.* at 2–3 (Holland Decl. ¶ 10).  Before making the changes, HMS started the reexamination process by looking at other transportation regulatory bodies, as the FRA had recommended in its 2005 Medical Standards for Railroad Workers Report.  *Id.* at 3 (Holland Decl. ¶ 11).  HMS determined that the most relevant policies—for seizures and other conditions—were the Federal Motor Carrier Safety Administration's (FMCSA) medical fitness-for-duty guidelines for commercial drivers.  *Id.*

---

[5]    Plaintiff tries to controvert this fact by citing a January 2005 report from the Federal Railroad Administration about medical standards for railroad workers.  Doc. 63-16.  This document doesn't controvert defendant's evidence that it began to reexamine its FFD evaluation process in 2011.

HMS found that it was reasonable to consider these FMCSA guidelines when determining if and how long an employee who had sustained an intracerebral hemorrhage presents an unacceptable risk of sudden incapacitation from a seizure. *Id.* (Holland Decl. ¶ 12). HMS reached this conclusion because the FMCSA guidelines: (1) are evidence-based; (2) had been developed through consensus of medical advisors and are periodically updated through expert consensus; and (3) were recognized by the NTSB as relevant to railroad workers in safety-critical positions in multiple railroad accident reports. *Id.* Dr. John Holland (defendant's Chief Medical Officer) testified that he was the primary author of defendant's medical standards. Doc. 63-4 at 58 (Holland Dep. 63:1–4). Also, he testified that he considered the language of 49 C.F.R. § 391.41(b)(8). *Id.* at 130–31 (Holland Dep. 145:1–146:15). This regulation requires that an employee presents a "likely" risk of losing consciousness. *Id.* But, Dr. Holland finds that term, "likely," ambiguous and prefers to evaluate whether an employee presents an acceptable or unacceptable probability of sudden incapacitation. *Id.*

According to Dr. Holland, once an employee is determined to have a current unacceptable risk of sudden incapacitation, defendant applies the appropriate sudden incapacitation restrictions. Doc. 60-26 at 3 (Holland Decl. ¶ 13). Defendant's sudden incapacitation restrictions are what HMS refers to as "functional work restrictions," meaning they focus on particular work functions or tasks rather than whether the person is qualified or disqualified for a particular job. *Id.* (Holland Decl. ¶ 14). Sudden incapacitation work restrictions do not disqualify an employee for a job automatically. *Id.* (Holland Decl. ¶ 15). Instead, HMS will notify the employee and his supervisor of the restrictions and ask the employee's supervisor (and in some cases higher-ranking mangers) whether the employee can

perform the essential functions of the job within those restrictions, either with or without reasonable accommodation. *Id.* at 3–4 (Holland Decl. ¶¶ 15–16).

On September 10, 2018, defendant extended plaintiff's medical leave of absence until January 3, 2019. Doc. 60-31 (September 10, 2018 Letter). Plaintiff provided HMS with his discharge records from Research Medical Center, medical records from Drs. Richardson and Rosenberg, and a letter from the VA about the status of plaintiff's diabetes. Doc. 60-2 at 23 (Pl.'s Dep. 89:4–20); *see also* Doc. 63-3 at 34, 36, 38–39 (Pl.'s Dep. 125:4–20, 127:9–18, 129:22–130:10) (testifying that plaintiff gathered and provided certain medical records to defendant). Plaintiff's FFD review included plaintiff's records from Dr. Rosenberg and Dr. Richardson. Doc. 63-4 at 84–85 (Holland Dep. 96:22–97:4). Dr. Richardson testified that no one from defendant reached out to her about her diagnosis of plaintiff during the FFD review. Doc. 63-7 at 26 (Richardson Dep. 34:19–24).

Plaintiff testified that he repeatedly contacted defendant during the FFD review process asking about his status of returning to work. Doc. 63-3 at 22–23 (Pl.'s Dep. 91:7–92:23). Plaintiff spoke with defendant's fit-for-duty nurse. *Id.* Also, he spoke with Dr. Holland. *Id.* Plaintiff testified that Dr. Holland never asked him any questions before concluding that plaintiff couldn't perform his job because of his risk of sudden incapacitation. *Id.* at 51 (Pl.'s Dep. 167:1–8).

### *Dr. Hughes Applies Restrictions*

Dr. Matthew Hughes (defendant's Associate Medical Director) reviewed plaintiff's medical records. Doc. 60-32 at 4–5 (Medical Comments History). Dr. Hughes is not a neurologist. Doc. 63-6 at 4 (Hughes Dep. 8:18–19). Dr. Hughes's review of plaintiff's medical records focused on the "extent" of plaintiff's brain hemorrhage. Doc. 60-32 at 4–5 (Medical

Comments History).  Also, Dr. Hughes asked for additional medical records from the VA to confirm that plaintiff wasn't using injectable insulin to control his diabetes.  Doc. 60-33 (August 31, 2018 Progress Notes); Doc. 60-5 (August 21, 2018 Letter).  Under defendant's Medical rules, using injectable insulin to treat diabetes is a reportable condition because individuals using injectable insulin can experience a hypoglycemic episode which, in turn, can cause incapacitation.  Doc. 60-23 at 84–85 (Holland Dep. 84:19–85:4).  After Dr. Hughes confirmed plaintiff wasn't using injectable insulin, his diabetes was not a factor in the FFD evaluation.  Doc. 60-34 at 5 (Hughes Dep. 17:17–20); Doc. 60-23 at 85 (Holland Dep. 85:5–16).

As part of his review, Dr. Hughes examined the notes taken by Dr. Rosenberg (plaintiff's neurologist).  Doc. 63-6 at 6 (Hughes Dep. 10:6–12).  Dr. Hughes copied Dr. Rosenberg's findings into his medical notes, but he never noted plaintiff's age or other demographic information.  *Id.* at 11 (Hughes Dep. 15:1–12); *see also* Doc. 60-32 (Medical Comments History).  Dr. Hughes noted that the medical records showed a "punctate lesion"—a condition that is considered small in size.  Doc. 63-6 at 10 (Hughes Dep. 14:7–25).  Also, he noted that plaintiff had no "neurologic deficits," meaning that he had "no overt symptoms or symptomatology from his injury."  *Id.* at 6 (Hughes Dep. 10:6–12).  And, Dr. Hughes noted Dr. Rosenberg's finding that the punctate lesion was "clinically insignificant" which—Dr. Hughes testified—can mean many things.  *Id.* at 11 (Hughes Dep. 15:1–12).  Dr. Hughes never contacted Dr. Rosenberg to ask what he meant by "clinically insignificant" finding.  *Id.* (Hughes Dep. 15:13–16).  And, Dr. Hughes never examined plaintiff.  *Id.* (Hughes Dep. 15:17–19).

Dr. Hughes testified that plaintiff has no history of epilepsy.  *Id.* at 17 (Hughes Dep. 21:8–12).  Dr. Hughes does not know if plaintiff ever has taken antiseizure medication.  *Id.* (Hughes Dep. 21:21–23).

After reviewing all medical records plaintiff had provided, Dr. Hughes found that the "presence of [a] subcortical hemorrhage represent[ed] a risk for seizure and sudden incapacitation similar to a stroke."  Doc. 60-32 at 3 (Medical Comments History).  Dr. Hughes recommended issuing sudden incapacitation restrictions for a five-year period based on the location of plaintiff's hemorrhage and the FMCSA guidelines.[6]  Doc. 60-34 at 4–5 (Hughes Dep. 11:13–17, 12:8–13, 16:23–17:16); *see also* Doc. 60-35 (Restriction Review Form).  Specifically, defendant issued the following restrictions:

- "Operation of Comp[any] Vehicles/On-Track or Mobile Equip./Forklifts— Prohibited";

- "Operation of Cranes, Hoists, or Machinery—Prohibited";

- "Work On or Near Moving Trains, Freight Cars or Locomotives—Prohibited"; and

- "Work at Unprotected Heights Over 4 Feet Above the Work Surface— Prohibited[.]"

Doc. 60-35 at 1 (Restriction Review Form); *see also* Doc. 58 at 3 (Pretrial Order ¶ 2.a.12.).  If an employee's restriction lasts for more than one year, defendant defines the restriction as a "permanent" restriction.  Doc. 63-6 at 7–8 (Hughes Dep. 11:18–12:17).  So, plaintiff's five-year restrictions were considered "permanent" from an administrative standpoint, but that term does not mean they apply "forever."  *Id.*

HMS provided superintendent Kelli Dunn with plaintiff's restrictions and asked whether defendant could accommodate plaintiff's restrictions.  Doc. 60-35 at 1–2 (Restriction Review

---

[6]     Dr. Hughes testified that the FMCSA handbook is no longer available online because it is being revised, but also he testified that he doesn't know whether the revisions include changes about treatment of intracranial hemorrhages.  Doc. 63-6 at 20–21 (Hughes Dep. 24:23–25:24).

Form).  Ms. Dunn completed the Restriction Review Form, noting that plaintiff's restrictions

interfered with the essential functions of plaintiff's position, and that defendant could not provide

reasonable accommodation.  *Id.*; Doc. 60-36 (September 28, 2018 email).  Ms. Dunn signed the

date on the Restriction Review Form as August 28, 2018.  Doc. 60-35 at 2.  However, the Form

itself is dated September 26, 2018.  *Id.* at 1.  And, two days later—on September 28, 2018—

defendant's employee, Rebecca Patrick, emailed that defendant wasn't able to accommodate

plaintiff's work restrictions.  Doc. 60-36 (September 28, 2018 email).

On October 1, 2018, defendant informed plaintiff by letter of the FFD decision.  Doc. 60-

37 (October 1, 2018 Letter).  Also, the letter advised that plaintiff's supervising department was

unable to identify a reasonable accommodation that would permit him to return to work safely in

his assigned position.  *Id.* at 1.  The letter provided an end date for his restrictions as December

31, 9999.  *Id.* at 2.  But, plaintiff testified, he understood that his work restrictions were for five

years.  Doc. 60-2 at 12, 32–33 (Pl.'s Dep. 46:4–10, 128:21–129:1).[7]  Defendant informed

plaintiff that he could seek reemployment by applying for open job positions with defendant or

other employers in the community.  Doc. 63-13 at 4 (October 1, 2018 Letter).

### *Plaintiff's Medical File is Reconsidered*

To confirm that the five-year functional work restrictions were appropriate, Dr. Hughes

requested an independent examination of plaintiff's medical file by an independent, board-

certified neurologist.  Doc. 60-34 at 3 (Hughes Dep. 9:9–17); Doc. 60-32 at 2–3 (Medical

Comments History); Doc. 60-23 at 10, 43–44 (Holland Dep. 10:15–24, 43:17–44:10).[8]  In cases

---

[7]     Also, plaintiff stipulated in the Pretrial Order that his work restrictions were "for a five-year
period[.]"  Doc. 58 at 3 (Pretrial Order ¶ 2.a.12.).

[8]     Plaintiff controverts that this review actually was "independent" because Dr. Holland testified
that defendant hires the reviewing physician and pays the physician $250 to $350 an hour for the work
involved in reviewing the file.  Doc. 60-23 at 27–28 (Holland Dep. 27:14–28:16).  Plaintiff cites no other

where an employee was facing longer-term functional work restrictions, it was common practice for HMS to request an external consultation with a specialist such as a neurologist.  Doc. 60-34 at 3–4 (Hughes Dep. 9:21–10:5).

In response to Dr. Hughes's request, Dr. Holland (defendant's Chief Medical Officer) arranged for Dr. Harris Frankel, Chief Medical Officer of Nebraska Medicine and Associate Professor in the Department of Neurological Science at the University of Nebraska Medical Center, to review plaintiff's relevant medical records, the job description for the Yardman position, and the FMCSA's guidance from the organization's Medical Expert Panels and Medical Review Board.  Doc. 60-26 at 4 (Holland Decl. ¶ 22); *see also* Doc. 58 at 3 (Pretrial Order ¶ 2.a.14.).  Dr. Holland testified that he trains reviewing physicians on the FMCSA standards because the physicians need to have "familiar[ity] with those documents before they can provide an opinion."  Doc. 63-4 at 90 (Holland Dep. 102:8–22).  Dr. Holland testified that he is not aware of any physician who has refused to find that defendant's use of the FMCSA guidelines is reasonable.  *Id.* at 87–88 (Holland Dep. 99:25–100:22).  Defendant doesn't provide any alternative standards for the reviewing physician to evaluate.  *Id.* at 90–91 (Holland Dep. 102:23–103:14).

Dr. Frankel's review found that plaintiff had most likely experienced a "[m]ild traumatic brain injury" with an associated "[t]raumatic intracerebral hemorrhage, right frontal lobe" when he fell from his motorcycle on July 15, 2018.  Doc. 60-28 at 7 (Frankel Report).[9]  Dr. Frankel

admissible evidence suggesting that this review actually was biased or flawed, and so, he simply contends that the review isn't independent because defendant paid the reviewing physician for his work.

[9]     Plaintiff objects to Dr. Frankel's letter as inadmissible hearsay to which no exception applies. Doc. 63-2 at 24.  But, as defendant's Reply correctly asserts, plaintiff stipulated to the admissibility of Dr. Frankel's report for purposes of summary judgment and trial in the Pretrial Order.  *See* Doc. 58 at 4, 6 (Pretrial Order ¶¶ 2.b.3., 2.b.34.).  The Pretrial Order "controls the course of the action unless the court modifies it."  Fed. R. Civ. P. 16(d); *see also* D. Kan. Rule 16.2(b) ("The pretrial order . . . will control the

opined that plaintiff's brain injury put him at "an increased risk for future sudden incapacitation." *Id.* at 8 (Frankel Report). Dr. Frankel found that applying the evidenced-based FMCSA guidelines for commercial vehicle drivers to railroad workers was reasonable because defendant's employees also worked in high risk environments where sudden incapacitation posed a risk of harm for all employees, the public, property, and the environment. *Id.* at 7–8 (Frankel Report). And, Dr. Frankel concluded, "restriction from safety sensitive positions for minimum of 5 years" (as advised by both the FMCSA and defendant's existing medical standards) was appropriate because plaintiff's traumatic brain injury placed him at risk of sudden incapacitation in the future. *Id.* at 8 (Frankel Report). Dr. Frankel provided his report to Dr. Holland on March 10, 2019. *Id.* at 5 (Frankel Report).

After receiving Dr. Frankel's report and discussing its findings and recommendations directly with Dr. Frankel, Dr. Holland approved the initial restrictions issued by Dr. Hughes. Doc. 60-39 (HMS FFD Memo); *see also* Doc. 58 at 3–4 (Pretrial Order ¶ 12.a.16.). Also, Dr. Holland added a few more restrictions. Doc. 60-39 (HMS FFD Memo). They included:

1. Not to operate company vehicles, on-track or mobile equipment, or fork-lifts.

2. Not to work on or near moving trains, freight cars or locomotives, unless protected by barriers.

3. Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee.

---

subsequent course of the action unless modified by consent of the parties and court, or by an order of the court to prevent manifest injustice."). Our Circuit has described a pretrial order as "the result of a process in which counsel define the issues of fact and law to be decided at trial, and it binds counsel to that definition." *R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987). Here, plaintiff has stipulated to the admissibility of Dr. Frankel's report and, absent a modification of the Pretrial Order, plaintiff is bound by his stipulation. *Id.* The court thus overrules plaintiff's hearsay objection. *See McGee v. Stonebridge Life Ins. Co.*, No. 05-4002-JAR, 2006 WL 2422399, at *1 (D. Kan. Aug. 14, 2006) (overruling hearsay objection to documents the parties stipulated to in the Pretrial Order as "constitut[ing] public records and reports within the scope of Fed. R. Evid. 803(8) and may be introduced in evidence during the trial without further foundation subject to objection based solely on grounds of relevancy").

4. Not to work at unprotected heights, over 4 feet above the ground.

5. Not to perform work where decisions or actions can affect the safety of others (not to work as a Train Dispatcher or similar safety sensitive positions).

6. If a new job assignment is considered, then HMS should review the functional job demands to determine if the employee can safely perform the essential functions of the job.

7. These restrictions are ongoing, but can be reassessed in **July 2023**, at which time a thorough medical evaluation should be done (with tests specific by Health and Medical Services).

*Id.* at 2. As Dr. Holland testified, the functional work restrictions issued to plaintiff were not permanent; defendant would reconsider them in five years. Doc. 60-23 at 107 (Holland Dep. 107:13–17); *see also* Doc. 58 at 3–4 (Pretrial Order ¶¶ 2.a.12., 2.a.16.) (stipulating that defendant recommended plaintiff's restrictions for five years).

Dr. Holland is not a neurologist. Doc. 63-4 at 8 (Holland Dep. 12:9–10). He never physically examined plaintiff. *Id.* at 22 (Holland Dep. 26:12–14). And, he never spoke with any of plaintiff's treating physicians. *Id.* at 68 (Holland Dep. 78:10–15). But also, he couldn't identify any information that plaintiff's physicians could have provided him that would have convinced him to eliminate plaintiff's work restrictions. *Id.* at 69–70 (Holland Dep. 79:14–80:25). Defendant never asked any of plaintiff's treating physicians to perform any additional tests. *Id.* at 119 (Holland Dep. 133:22–25). But, Dr. Holland isn't aware of any test that would have changed his assessment of plaintiff's work restrictions. *Id.* at 124 (Holland Dep. 139:15–21).

When reviewing and approving plaintiff's restrictions, Dr. Holland never reviewed any records suggesting that plaintiff ever had experienced a seizure. *Id.* at 48 (Holland Dep. 53:12–18). He testified that the way to measure the risk of a future seizure is by looking at

epidemiology or population statistics and comparing that information in the literature to a person with plaintiff's individual risk factors. *Id.* at 52–53 (Holland Dep. 57:4–58:18). As part of his review of plaintiff's medical records, Dr. Holland did not review plaintiff's CT scan. *Id.* at 84–85 (Holland Dep. 96:22–97:8).

Dr. Holland testified that, in some instances, defendant's medical standards could impose more restrictions than FMCSA guidelines. *Id.* at 91 (Holland Dep. 103:18–22). Also, Dr. Holland testified that no federal law applies specifically to conductors or yardmen like plaintiff, who have sustained an acute intracerebral hemorrhage. *Id.* at 16–17 (Holland Dep. 20:21–21:1). According to Dr. Holland, "if there is a risk of sudden incapacitation that's greater than 1 percent per year," defendant considers that an "unacceptable risk for sudden incapacitation[.]" *Id.* at 60 (Holland Dep. 65:4–19). Defendant's work restrictions for sudden incapacitation risk apply for five years for an employee who has sustained an intracerebral hemorrhage, even if the employee never has experienced a seizure. Doc. 63-11 at 2 (Defendant's Medical Standards). Also, defendant's policy treats strokes and intracerebral hemorrhage the same, applying the same five-year waiting period to strokes and intracerebral hemorrhages (depending on the location of the intracerebral hemorrhage). Doc. 63-4 at 107 (Holland Dep. 119:12–15); *see also* Doc. 63-11 at 2 (Defendant's Medical Standards). Defendant's medical standards require that an employee who returns to work after a five-year restriction for a brain injury must undergo an annual neurological evaluation. Doc. 63-11 at 2 (Defendant's Medical Standards).

### *HMS Rational for FFD Determinations*

Dr. Holland testified that, when making a FFD determination for a safety-critical worker who had sustained a brain hemorrhage during the 2018–19 time period, HMS medical directors would (1) conduct an individualized evaluation of the employee's relevant medical history and

current clinical status; (2) assess the employee's current risk for sudden incapacitation from a future seizure or other cause; and (3) determine whether the employee had a functional impairment that posed a significant risk at work.  Doc. 60-23 at 110–112 (Holland Dep. 123:9–125:2).  When determining whether an employee with a brain hemorrhage presented a current acceptable or unacceptable risk for sudden incapacitation, it was HMS's practice to rely on relevant evidence in the scientific literature about the risk for seizure or other cause of sudden incapacitation after a hemorrhagic brain injury.  *Id.* at 15–16, 19–20 (Holland Dep. 15:17–16:24, 19:19–20:8); *see also* Doc. 60-26 at 3 (Holland Decl. ¶ 12).  HMS specifically relied on guidance from the FMCSA, including evidence-based recommendations of the FMCSA Medical Examiner Handbook.  *Id.*

The sudden incapacitation of a safety-critical worker could lead to train derailments or other accidents causing explosion, fire, or release of hazardous material.  Doc. 60-23 at 66–69 (Holland Dep. 66:3–69:22); Doc. 60-26 at 6 (Holland Decl. ¶¶ 30–31); Doc. 60-30 at 61–138 (Holland Decl. Exs. 7 & 8).  Such accidents, in turn, can harm employees, members of the public, property, and the environment.  *Id.*  Dr. Holland provided two examples of train collisions—(1) one where an engineer with a history of seizures blacked out and failed to brake at the end of the track, and (2) another where the engineer failed to see and interpret signals correctly.  Doc. 60-26 at 6 (Holland Decl. ¶¶ 30–31); Doc. 60-30 at 61–138 (Holland Decl. Exs. 7 & 8).  The first incident caused nearly $200,000 in property damage; the second incident killed two employees, ruptured several fuel tanks, and caused about $14.9 million in property damage. *Id.*  After these incidents, the NTSB issued recommendations that defendant (a) identify all employees in safety-critical positions who have any history of seizures, sleep disorder, or other

conditions presenting a risk of sudden incapacitation, and (b) ensure its current standard of fitness-for-duty is met by each employee.  Doc. 60-26 at 2 (Holland Decl. ¶ 6).

The FMCSA Medical Examiner Handbook is based on medical experts' systematic review of the literature and guidance from that review.  *Id.* at 3, 5 (Holland Decl. ¶¶ 12, 28); Doc. 60-30 at 24–31 (FMCSA Handbook).  The FMCSA Handbook provides that the "risk for seizures following intracerebral and subarachnoid hemorrhages is associated with the location of the hemorrhage."  Doc. 60-30 at 25 (FMCSA Handbook).  Also, it states that cortical and subcortical hemorrhages are associated with an increased risk for seizures, while cerebellum and brainstem vascular hemorrhages are not.  *Id.* at 25–26.  Thus, the FMCSA recommends different waiting periods for hemorrhages based on their location.  *Id.* at 26.  Those waiting periods are:

> Minimum—1 year if not at risk for seizure (cerebellum or brainstem vascular lesions)
>
> Minimum—5 years if at risk for seizure (cortical or subcortical deficits)

*Id.*

Plaintiff's medical records and his neurosurgeon confirmed that he sustained an intracerebral hemorrhage in the anterior superior aspect of the right frontal lobe—*i.e.*, the subcortical region of his brain.  Doc. 60-6 (July 15, 2018 CT Scan Report); Doc. 60-7 at 3 (Rosenberg Dep. 10:7–24).

### *Plaintiff's Deposition Testimony*

Plaintiff testified that his July 2018 motorcycle accident was not disabling.  Doc. 60-2 at 13 (Pl.'s Dep. 50:5–52:19).  He testified that neither his intracerebral hemorrhage nor his broken ribs substantially limited any major life activity.  *Id*; *see also id.* at 14–15 (Pl.'s Dep. 54:4–57:21).  Also, plaintiff testified that he was not disabled because of his diabetes because it does not substantially limit any major life activity.  *Id.* at 12–13 (Pl.'s Dep. 47:20–50:4).

After his July 2018 motorcycle accident, plaintiff never requested an accommodation to perform the essential functions of the Yardman position. *Id.* at 19 (Pl.'s Dep. 74:12–75:2). Since his July 2018 motorcycle accident, plaintiff never lacked the capability to work or carry out any other major life activity. *Id.* at 37 (Pl.'s Dep. 145:21–146:1).

Plaintiff testified that he hasn't had a seizure or experienced unconsciousness since his motorcycle accident in 2018. Doc. 63-3 at 14 (Pl.'s Dep. 81:23–25). Plaintiff testified that he ably has operated heavy machinery since September 2018. *Id.* at 43–44 (Pl.'s Dep. 159:20–160:11). He still has a valid driver's license. *Id.* at 42–43 (Pl.'s Dep. 158:16–159:7). And, no physician has warned plaintiff that he shouldn't drive because of a risk of seizures. *Id.* Plaintiff testified that he believes he can perform all the functions of his job as a Yardman, and he has no reason to believe that anything would prevent him from performing the job functions. *Id.* at 45–49 (Pl.'s Dep. 161:5–165:4).

## II.    Summary Judgment Standard

The standard for deciding summary judgment under Federal Rule of Civil Procedure 56 is a familiar one. Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]"  *Celotex*, 477 U.S. at 323.  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted).  To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]"  *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Defendant argues that it deserves summary judgment because the facts present no genuine dispute whether defendant, by issuing work restrictions for plaintiff that prevented him from performing the essential functions of his job as a Yardman, violated the ADAAA or FMLA.  The court addresses plaintiff's three claims, in turn, below.

### A.  ADAAA Discrimination

The ADAAA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may prove an ADAAA discrimination claim "through either direct or circumstantial evidence" of discrimination. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th Cir. 2021). Where, as here, a plaintiff offers only circumstantial evidence of discrimination,[10] the court analyzes the discrimination claim under the *McDonnell Douglas* burden-shifting framework. *Id.*

The *McDonnell Douglas* analysis consists of three steps. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 995 (10th Cir. 2019). "First, the plaintiff must make out a prima facie case of discrimination[.]" *Id.* (citation omitted). If plaintiff satisfies the initial burden, then the "burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (citation and internal quotation marks omitted). And, if "defendant proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely pretextual." *Id.* (citation and internal quotation marks omitted). The court addresses each step of the *McDonnell Douglas* framework, below.

---

[10]     Defendant's opening summary judgment brief argues that the summary judgment record presents no direct evidence of disability discrimination. Doc. 60 at 25–27. Plaintiff's Opposition never responds to this argument. *See generally* Doc. 63. Instead, to oppose the summary judgment motion as it applies to his claim for ADAAA discrimination, plaintiff merely relies on circumstantial evidence. Specifically, he argues that the summary judgment facts present a triable issue whether: (1) plaintiff has established a prima facie case of discrimination, *id.* at 3–12, and (2) defendant's reason for terminating plaintiff's employment was pretext for disability discrimination, *id.* at 13–16. Thus, the court only analyzes plaintiff's ADAAA discrimination claim under the *McDonnell Douglas* burden-shifting framework for claims involving circumstantial evidence. And, because plaintiff never responds to defendant's argument that no direct evidence of discrimination exists, the court concludes that plaintiff has abandoned any ADAAA claim premised on a direct evidence theory. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that plaintiff had abandoned claim because he had not addressed it in his memorandum opposing summary judgment); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1337 (D. Kan. 2008) (concluding that plaintiff had abandoned his retaliation claim by not responding to defendant's motion for summary judgment against claim).

### 1.  Prima Facie Case

"The first step of the *McDonnell Douglas* burden-shifting framework requires the plaintiff to establish a prima facie case of discrimination by showing (1) 'that he is disabled within the meaning of the ADA'; (2) that he is qualified for the job held or desired; and (3) 'that he was discriminated against because of his disability.'"  *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (quoting *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2016)).  Defendant asserts that the summary judgment facts present no triable issue on any of the three prima facie elements.  The court addresses just one of the elements because it's dispositive.  The summary judgment facts present no jury question on the second element—whether plaintiff was qualified for the job.  Thus, plaintiff cannot establish a prima facie case of ADAAA discrimination premised on the head injury he sustained in his 2018 motorcycle accident.[11]

### a.  Plaintiff wasn't qualified to perform his job.

For the second element of a prima facie case of ADAAA discrimination, "the ADA defines 'qualified individual' as 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Lincoln*, 900 F.3d at 1192 (quoting 42 U.S.C. § 12111(8)).  To demonstrate that plaintiff is a "qualified individual," he must make two showings.  *Id.*  First, plaintiff must "'establish that he had "the requisite skill, experience, education and other job-related

---

[11]    Defendant's opening summary judgment brief concedes that plaintiff's diabetes is an actual disability under the ADAAA.  Doc. 60 at 28 n.4.  But, defendant argues, plaintiff can't establish a prima facie case of ADAAA discrimination based on his diabetes because plaintiff was not a qualified individual and plaintiff can't show that defendant took any adverse action against him because of his diabetes.  Plaintiff's Opposition doesn't respond to this argument.  *See generally* Doc. 63.  Instead, it just argues that defendant discriminated against plaintiff based on his head injury.  *Id.*  Because plaintiff hasn't responded to defendant's arguments about his diabetes, the court concludes that plaintiff has conceded any ADAAA claim premised on his diabetes.

requirements of the employment position."'" *Id.* (quoting *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (quoting 29 C.F.R. § 1630.2(m))).  Second, he must establish that he can perform the position's "essential functions." *Id.*

But, when "'the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others.'" *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (quoting *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004)).  Indeed, the ADAAA includes "a defense to a charge of discrimination" that applies "if an employee poses a direct threat to the health or safety of himself or others." *Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1091 (10th Cir. 2008).  The ADAAA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3).  The implementing regulations instruct:

> The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.  This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence.  In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1)  The duration of the risk;
>
> (2)  The nature and severity of the potential harm;
>
> (3)  The likelihood that the potential harm will occur; and
>
> (4)  The imminence of the potential harm.

29 C.F.R. § 1630.2(r).  Although an employer typically bears "the burden of showing that an employee is a direct threat[,] . . . 'where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others.'" *Justice*, 527 F.3d at 1091 (quoting *McKenzie*, 388 F.3d at 1354).

When considering the "direct threat" defense to an ADAAA discrimination claim, "the fact-finder does not independently assess whether it believes that the employee posed a direct threat." *Jarvis*, 500 F.3d at 1122. Instead, "the fact-finder's role is to determine whether the employer's decision was objectively reasonable." *Id.* (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)).

Defendant asserts that the summary judgment facts present no genuine issue whether plaintiff safely could perform the essential functions of his job. The court agrees. The summary judgment facts establish that the Yardman position was a safety-critical job requiring plaintiff to operate trains remotely. It's undisputed that the position requires good concentration, focus, alertness, insight, judgment, and impulse control. Also, the job duty of operating a locomotive by remote control poses danger and a risk of harm for employees, the public, property, and the environment. After plaintiff sustained his head injury, defendant conducted a FFD evaluation of plaintiff to determine whether he still could perform his job safely. Three doctors—Dr. Hughes, Dr. Frankel, and Dr. Holland—conducted individualized reviews of plaintiff's medical records. They considered plaintiff's intracerebral hemorrhage, its location, and the risk that this injury posed for sudden incapacitation in the future. Relying on guidance from the FMCSA, they concluded that plaintiff's head injury presented a risk of seizure or sudden incapacitation for the five years following his injury. And, considering plaintiff's job duties and the safety-critical nature of the position, they found it reasonable to impose work restrictions on plaintiff lasting five years.

These undisputed facts leave no genuine issue whether defendant's decision to impose five-year work restrictions on plaintiff was "objectively reasonable." *Jarvis*, 500 F.3d at 1122; *see also Krehbiel v. Union Pac. R.R. Co.*, No. 19-2002-JAR, 2020 WL 5503363, at *9–11 (D.

Kan. Sept. 20, 2020) (concluding that plaintiff could not "demonstrate that there are questions of fact as to the objective reasonableness of [d]efendant's determination that [p]laintiff was a direct threat" when "two doctors . . . issued work restrictions based on a review of [p]laintiff's medical history, determining that work restrictions were necessary due to the risk of harm to [p]laintiff or others, with knowledge of [p]laintiff's job duties" as an Assistant Signalperson for the defendant railroad).  In sum, no genuine issue exists whether plaintiff was a qualified individual under the ADAAA.

Plaintiff disagrees, of course.  He contends that the summary judgment facts leave triable issues whether he could perform the essential functions of the position and whether he was a direct threat.  Plaintiff asserts several arguments, trying to support his position, but none of them preclude the court from concluding that plaintiff has failed to make a submissible prima facie case of ADAAA discrimination.

*First*, plaintiff cites his 13-year employment history with defendant and defendant's failure to give him any physical test or examination to determine whether he could perform the essential functions of his job.  To support this argument, plaintiff relies on an out-of-Circuit case, *Campbell v. Union Pacific Railroad*, No. 4:18-cv-00522-BLW, 2020 WL 5300734 (D. Idaho Sept. 4, 2020).  *Campbell*'s facts differ markedly from the summary judgment facts here.  The *Campbell* plaintiff had a below-the-knee amputation on his right leg and used a prosthesis.  *Id.* at *1.  Plaintiff disclosed his amputation when he applied for a job with defendant in 2017.  *Id.* After clearing a medical check and physical ability test, he started working for defendant on April 3, 2017.  *Id.*  About a month later, plaintiff's supervisor observed that he was walking with a limp, plaintiff showed the supervisor his prosthesis, and the supervisor initiated an FFD review. *Id.*  The FFD review led defendant to impose permanent work restrictions on plaintiff that

prevented him from returning to work with defendant.  *Id.*  The Idaho court concluded that a triable issue existed whether the *Campbell* plaintiff was able to perform the essential functions of the job because the record included evidence of plaintiff's "prior work history in a physically strenuous position, professional and expert opinions concluding he is not restricted by his prosthesis, video and photo evidence showing [plaintiff] walking on uneven terrain and climbing ladders without issue, and evidence that he performed many of the Trainman duties without incident during his training."  *Id.* at *6.

Unlike *Campbell*, plaintiff here has adduced no expert opinions that plaintiff was able to perform the essential functions of the job safely.  Also, unlike the *Campbell* plaintiff, who "performed many of the Trainman duties without incident during his training" as an amputee and with his prothesis, *id.*, plaintiff here performed his job duties for 13 years *before* he sustained his head injury.  Our Circuit has rejected a similar argument based on an employee's past work performance because the "law does not require [a defendant] to wait for serious injury before eliminating such a threat."  *See Jarvis*, 500 F.3d at 1124 (noting that plaintiff's "good record before the PTSD incidents occurred" didn't preclude summary judgment against plaintiff's discrimination claim).

Also, defendant's failure to give plaintiff a physical test or examination before imposing the work restrictions doesn't present a genuine issue whether he could perform the essential functions of the job.  To the contrary, our Circuit has held that an employer need not perform an independent examination when the available objective evidence is clear.  *See id.* ("We disagree with [plaintiff's] contention that [defendant] should have sought further medical advice or conducted a fitness-for-duty examination" because defendant "could reasonably rely on the evidence it already had"); *see also Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1090 (10th Cir.

1997) (holding that employer is not required to conduct "independent medical examination when the available objective evidence is clear"). The summary judgment facts here show that three doctors reviewed clear, objective evidence and reasonably determined that imposing five-year work restrictions on plaintiff was warranted because his head injury posed a risk of sudden incapacitation.

*Second*, plaintiff asserts that his release to return to work without restrictions from Dr. Richardson presents a fact issue whether he could perform the essential functions of the job. To support his argument, he relies on a Fifth Circuit decision reversing, in part, a grant of summary judgment for the employer. *See Nall v. BNSF Ry. Co.*, 917 F.3d 335 (5th Cir. 2019). The Fifth Circuit concluded that fact issues existed whether plaintiff was qualified to perform the essential functions of his job safely. *Id.* at 346–47. Specifically, the Circuit noted that the *Nall* plaintiff had come forward with evidence that defendant:

> (1) disregarded [plaintiff's] medical release forms; (2) relied on safety violations they later identified in [plaintiff's] field test despite his successful completion of the assigned tasks; (3) changed the trainman job description to incorporate tasks that an individual with Parkinson's may have difficulty performing; and (4) made comments indicating a belief that Parkinson's categorically disqualified an individual from working as a trainman[.]

*Id.* at 346. The Fifth Circuit concluded that this evidence "call[ed] into question the credibility of [defendant's] decision to disqualify him[,]" and when "[t]aken together, this evidence create[d] a material fact issue on the question of whether [defendant] considered the best available objective evidence and meaningfully engaged in an individualized assessment of [plaintiff]." *Id.* at 346–47.

But here, in the current case, plaintiff hasn't adduced any evidence similar to the four types of evidence amassed by *Nall*'s plaintiff. For instance, the *Nall* plaintiff offered medical opinions by four doctors who concluded that "he could perform his job duties safely." *Id.* at 345.

33

In contrast, here, plaintiff offers just the release to return-to-work without restrictions from his treating physician, Dr. Richardson. But Dr. Richardson isn't a neurologist and does not specialize in treating diseases of the brain. Doc. 60-10 at 3 (Richardson Dep. 9:25–10:5, 12:1–22). Dr. Richardson testified that she wasn't familiar with the essential job functions of plaintiff's job or its safety-critical nature. *Id.* at 6–7 (Richardson Dep. 24:15–25:19). She knew plaintiff worked for defendant in the Yard, but she never reviewed the job description for defendant's position. *Id.* at 4–5 (Richardson Dep. 16:12–18:16). Also, she never conducted an assessment to determine if plaintiff was at risk for seizures, or whether his risk for future seizures would affect his ability to perform the essential functions of his job safely. *Id.* Thus, no reasonable juror could conclude from Dr. Richardson's work release that plaintiff was qualified to perform the essential functions of his job safely. *See Revels v. Lucent Techs., Inc.*, 60 F. App'x 740, 745–46 (10th Cir. 2003) (affirming summary judgment against disability discrimination claim when plaintiff's medical release didn't provide an adequate explanation about plaintiff's ability to return to work); *Krehbiel*, 2020 WL 5503363, at *10 (explaining that the *Krehbiel* facts differed from *Nall* because "although [p]laintiff's personal physician opined that [p]laintiff could return to work, her determination rested on incomplete information because it relied on [p]laintiff's self-reporting" and physician "had no knowledge of [p]laintiff's specific job duties" while in "contrast, there are two doctors who issued work restrictions based on a review of [p]laintiff's medical history, determining that work restrictions were necessary due to the risk of harm to [p]laintiff or others, with knowledge of [p]laintiff's job duties").

*Third*, plaintiff testified that he believes he can perform the essential functions of his job. Also, he testified that he recently has operated heavy machinery and still holds a valid driver's license. But, plaintiff offers no evidence showing that the ability to operate heavy machinery on

34

some undefined number of occasions and drive a personal vehicle means he can perform the essential functions of the Yardman position—which includes the job duty of operating by remote control trains weighing some 325,000 pounds and locomotives containing hazardous materials. None of plaintiff's "self-serving testimony" about his ability to perform essential functions of the job presents a genuine factual issue whether he is qualified.  *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1121 (10th Cir. 2004) (holding that plaintiff's "own testimony that she could perform the essential functions of" her job was "self-serving" and "insufficient . . . to create a 'genuine' issue of material fact concerning the essential functions of the [job]").

*Fourth*, plaintiff argues that he is qualified to perform essential functions of the job because he hasn't had a seizure or lost consciousness since his July 2018 motorcycle accident. But, the "'determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision.'"  *Corley v. Dep't of Veterans Affs. ex rel. Principi*, 218 F. App'x 727, 737 (10th Cir. 2007) (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)).  Although plaintiff testified that he hasn't had a seizure or lost consciousness since July 2018, he hadn't come forward with evidence supporting a triable issue whether defendant's decision to impose plaintiff's work restrictions in October 2018 (and again in March 2019 after Dr. Frankel's review) was objectively unreasonable.  To the contrary, the summary judgment facts show that three doctors made an individualized assessment of plaintiff's medical records and, after considering the safety-critical job functions of plaintiff's position and the FMCSA guidance, determined that plaintiff's five-year work restrictions were reasonable because plaintiff's head injury posed a risk of future sudden incapacitation.  As already explained, our Circuit has held that "the law does not require [an employer] to wait for a serious

injury before eliminating such a threat." *See Jarvis*, 500 F.3d at 1124.  So, even if defendant's

concerns about a sudden incapacitation haven't come to fruition since plaintiff's motorcycle

accident, that fact doesn't present a jury question precluding summary judgment.

      *Fifth*, plaintiff accuses defendant of engaging in a "bad faith interactive process" that

never considered if it could accommodate plaintiff's restrictions.  Doc. 63 at 9–11.  But, as

defendant correctly explains, this argument fails for a host of reasons.  To start, plaintiff never

alleged a claim for failure to accommodate or failure to engage in the interactive process in the

Pretrial Order.  *See generally* Doc. 58.  Because plaintiff hasn't asserted a failure to

accommodate claim in the Pretrial Order, he therefore has abandoned any claim based on that

theory.  *See, e.g.*, *Gordon-Howell v. Penn-Plax, Inc.*, 232 F. Supp. 2d 1251, 1255 n.5 (D. Kan.

2002) (holding that plaintiff's failure to assert FMLA claim in the Pretrial Order meant that

"[p]laintiff has therefore abandoned any claim under the FMLA").  Also, plaintiff explicitly

testified that, following his July 2018 motorcycle accident, he never requested an

accommodation to perform the essential functions of the Yardman position.  Doc. 60-2 at 19

(Pl.'s Dep. 74:12–75:2).  As our Circuit has explained, a "failure to accommodate claim does not

arise until after the employee 'request[s] a plausible reasonable accommodation.'"  *Lincoln*, 900

F.3d at 1206 (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017)).  Thus,

because plaintiff never asked for a reasonable accommodation, he cannot assert a claim based on

a failure to accommodate.  And, even if plaintiff had requested a reasonable accommodation, he

can't prevail on a failure to accommodate claim unless he can show "that a reasonable

accommodation was possible."  *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1265 (10th

Cir. 2009).  Here, plaintiff never even argues that a reasonable accommodation was possible.

Instead, the evidence shows that defendant imposed reasonable work restrictions on plaintiff

because of the risk of sudden incapacitation, plaintiff's supervisor considered those restrictions in light of plaintiff's job duties, and plaintiff's supervisor determined that the restrictions interfered with essential functions of plaintiff's position and no reasonable accommodation was available.  From these facts, no reasonable jury could find or infer that plaintiff was able to perform the essential functions of his position with or without reasonable accommodation.  For all these reasons, plaintiff's argument about an alleged "bad faith interactive process" doesn't present a genuine issue precluding summary judgment.

*Finally*, plaintiff argues, a reasonable jury could conclude that he did not pose a "direct threat" to the safety of himself or others because he was unlikely to have a seizure.  Doc. 63 at 17–20.  But, this just isn't the right test to apply.  As already explained, when considering the "direct threat" defense to an ADAAA discrimination claim, "the fact-finder does not independently assess whether it believes that the employee posed a direct threat."  *Jarvis*, 500 F.3d at 1122.  Instead, "the fact-finder's role is to determine whether the employer's decision was *objectively reasonable*."  *Id.* (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)) (emphasis added).

Even so, the evidence plaintiff cites to show that he isn't a "direct threat" doesn't present a jury question whether defendant's decision to impose the five-year work restrictions was objectively reasonable.  Plaintiff asserts that neither Dr. Rosenberg nor Dr. Richardson advised him that he had a risk of seizure or sudden incapacitation.  But, it's undisputed that Dr. Rosenberg never released plaintiff to return to work and never assessed plaintiff's ability to perform the essential functions of his job.[12]  Doc. 60-7 at 5 (Rosenberg Dep. 20:11–17).  And, as

---

[12]     Also, to the extent plaintiff argues that he was capable of performing the essential functions of his job because Dr. Rosenberg's review of plaintiff's CT scan determined that the hemorrhage's size did "not represent a clinically significant finding[,]" Dr. Rosenberg testified that the "clinically insignificant"

already discussed, it's undisputed:  Dr. Richardson isn't a neurologist, isn't familiar with the job

duties of plaintiff's position, and never assessed plaintiff for a risk of seizures.  Doc. 60-10 at 3–

5 (Richardson Dep. 9:25–10:5, 12:1–22, 16:12–18:16, 19:1–9).

Next, plaintiff returns to his arguments about not having had a seizure since the

motorcycle accident, his ability to operate heavy machinery, and his ability to drive a car with his

valid driver's license.  For reasons already explained, plaintiff's testimony about his ability to

perform the essential functions of the job can't create a genuine issue of fact whether defendant's

decision to impose work restrictions was objectively reasonable.  *See supra* pp. 34–35.

Last, plaintiff criticizes defendant's policy of applying FMCSA guidance when

conducting the FFD review.  He argues that these guidelines apply to the trucking industry—not

the railroad industry—and currently the guidelines are undergoing revision.  But, there's no

evidence in the summary judgment record providing the reasons for the revisions or showing that

the revisions affect the way the guidelines treat intracranial hemorrhages.  Doc. 63-6 at 20–21

(Hughes Dep. 24:23–25:14).  Instead, the summary judgment facts show that defendant made the

decision to apply FMCSA guidance because it is evidence-based, developed and updated by

medical advisors and experts, and recognized by the NTSB as relevant to railroad workers in

safety-critical positions.  Doc. 60-26 at 3 (Holland Decl. ¶ 12).  Also, plaintiff argues that

defendant's policy doesn't apply the C.F.R.'s guidelines for the trucking industry accurately.

But, Dr. Holland explicitly testified that he considered the language of 49 C.F.R. § 391.41(b)(8)

requiring that an employee have a "likely" risk of losing consciousness when he developed

defendant's guidelines.  Doc. 63-4 at 130–31 (Holland Dep. 145:1–146:15).  And, he testified, he

considers the regulation's use of the term "likely" as ambiguous and prefers to evaluate whether

---

finding meant that neurosurgery was not necessary.  Doc. 60-7 at 4 (Rosenberg Dep. 13:15–14:25).  The
"clinically insignificant" finding didn't determine plaintiff's abilities to perform his job safely.

an employee has an acceptable or unacceptable probability of sudden incapacitation.  *Id.*  No

reasonable trier of fact could find from this evidence that defendant's use of the FMCSA

guidance wasn't objectively reasonable.

Plaintiff argues that these facts are similar to ones at issue in *Justice v. Crown Cork &*

*Seal Co., Inc.*, 527 F.3d 1080 (10th Cir. 2008).  *Justice* reversed summary judgment against a

plaintiff's disability discrimination claim because, the Circuit found, "a triable issue of material

fact exist[ed] as to whether [plaintiff] actually posed a direct threat to plant safety."  *Id.* at 1091–

92.  But, the *Justice* summary judgment facts don't match the ones presented here.  *Justice*

involved a defendant employer who concluded that plaintiff couldn't work safely as an

electrician because of his vertigo and balance issues.  *Id.* at 1087.  The summary judgment

evidence showed that defendant "believed that [plaintiff's] balance problems posed a threat when

he was working around electricity," but this belief was "unsupported by any of the medical

opinions in the record."  *Id.* at 1088.  Also, the Circuit noted there was a "question whether [the

physical therapist's] opinion can be considered 'objective'" and the record contained "much

evidence" suggesting "that [plaintiff's] restrictions, as recognized by [two doctors], may not have

limited [plaintiff's] ability to perform safely in his environment and that [defendant's]

application of the medical judgments to the workplace was unreasonable."  *Id.* at 1091–92.

Here, defendant's work restrictions aren't "unsupported" by the medical opinions in the record.

To the contrary, the summary judgment facts include medical opinions of three doctors who

conducted an individualized review of plaintiff's medical records, considered the safety-critical

job functions of plaintiff's position, and applied FMCSA guidance to determine that plaintiff's

work restrictions were warranted in light of the risk of future sudden incapacitation.  The court

already has explained why Dr. Rosenberg and Dr. Richardson's records don't create a genuine

issue on this question because neither of them assessed plaintiff's ability to perform the essential functions of the Yardman position.  Thus, plaintiff hasn't come forward with evidence creating a triable issue whether defendant's decision to impose work restrictions on plaintiff—based on a concern that he posed a direct threat to safety—was objectively reasonable.

In sum, the summary judgment facts present no triable issue whether plaintiff was qualified to perform his job.  Thus, he fails to meet the second requirement of a prima facie case for ADAAA discrimination.  And, because plaintiff hasn't adduced evidence permitting a reasonable jury to find for plaintiff on the requirements of his prima facie case, defendant deserves summary judgment against plaintiff's ADAAA discrimination claim.

## 2.  Legitimate, Nondiscriminatory Reason

Because plaintiff has failed to present a prima facie case of ADAAA discrimination, the court could end its analysis here.  Nevertheless, even if plaintiff could establish a prima facie case of discrimination, his ADAAA claim still cannot survive summary judgment because defendant has come forward with a legitimate, nondiscriminatory reason for placing work restrictions on plaintiff.  *See Tesone*, 942 F.3d at 995 (explaining that if plaintiff make a prima facie case of discrimination, then "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions" (citation and internal quotation marks omitted)).  And, as discussed in the next section, the summary judgment facts don't present any triable issue whether defendant's proffered reason was pretext for discrimination.

Here, the summary judgment facts show that defendant conducted an individual medical assessment of plaintiff to determine whether he could perform his job safely after sustaining a head injury in a motorcycle accident and in light of the FMCSA guidance.  Defendant's medical review resulted in five-year work restrictions imposed on plaintiff based on plaintiff's risk for

seizure or sudden incapacitation.  And, defendant determined, based on plaintiff's work restrictions, he couldn't perform the essential functions of his safety-critical job as a Yardman. The court concludes defendant had discharged its burden at the second stage of the *McDonnell Douglas* analysis.  Defendant has come forward with a legitimate, non-discriminatory reason for its employment decision.

### 3.  Pretext

Once an employer proffers a legitimate, nondiscriminatory reason for its employment decision—as defendant here had done—"the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely pretextual." *Tesone*, 942 F.3d at 995 (citations and internal quotation marks omitted).  "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln*, 900 F.3d at 1193 (citation and internal quotation marks omitted).  "This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (citation and internal quotation marks omitted).

Plaintiff asserts several reasons why the summary judgment facts present a triable issue of pretext.  None of them can sustain plaintiff's burden, however.  That is, none of plaintiff's asserted summary judgment facts present a jury question whether defendant's proffered reason for determining that plaintiff couldn't perform safely the essential functions of the Yardman position was pretext for discrimination.

*First*, plaintiff argues that defendant's medical standards present a genuine issue of pretext because they aren't consistent with the FMCSA guidelines, specifically the language of

49 C.F.R. § 391.41(b)(8).  As already discussed, Dr. Holland testified that he considered the language of the regulation, but that he preferred not to use its term, "likely," because he thinks it is ambiguous.  Doc. 63-4 at 130–31 (Holland Dep. 145:1–146:15).  Dr. Holland provided valid reasons for defendant's use of its medical standards and its reliance on the FMCSA standards but not the C.F.R.'s language.  As our Circuit has instructed, the question whether a defendant's proffered reason is pretext doesn't "ask whether the employer's reasons were wise, fair or correct[.]"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007).  Instead, "the relevant inquiry is whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.  A court must "consider the facts as they appeared to the person making the decision," and must not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."  *Id.*  Here, the summary judgment record lacks evidence supporting a finding or inference that defendant relied in bad faith on its medical standards or the FMCSA guidance or was pretext for discrimination.  To the contrary, the summary judgment facts show that defendant's medical standards relied on evidence-based guidance that medical advisors and experts had developed and updated, and also that the NTSB recognized those standards as ones relevant to railroad workers in safety-critical positions.  Doc. 60-26 at 3 (Holland Decl. ¶ 12).  Plaintiff's first argument doesn't establish a genuine issue of pretext.

     *Second*, plaintiff argues that defendant's FFD review creates the perception of an individualized medical review but, instead, defendant simply imposes the same restrictions on all employees who have the same condition.  Doc. 63 at 14–15; *see also id.* at 15 (alleging that defendant's policy "has created a blanket ban on all employees with" intracranial hemorrhages).  For support, plaintiff cites a Texas federal case concluding—on entirely different facts—that the

summary judgment record there presented a triable issue whether Dr. Holland failed to conduct

an individualized assessment of that plaintiff's ability to perform his job safely. *See West v.*

*Union Pac. R.R. Co.*, No. 4:18-CV-3340, 2020 WL 1446908, at *4 (S.D. Tex. Mar. 24, 2020).

*West* involved a plaintiff who had attempted suicide and suffered from severe depression. *Id.* at

*5. Dr. Holland[13] determined that the plaintiff had a higher likelihood of attempting suicide

again than a person who had never attempted suicide, but he didn't cite "any medical research or

any other basis for this conclusion." *Id.* And, *West*'s summary judgment record included a

conflicting medical opinion from "a psychiatrist with special training related to suicide" and who

had "reviewed [plaintiff's] job duties as a conductor in detail[.]" *Id.* From these facts, the Texas

court concluded that "a reasonable jury could conclude that [defendant] did not consider the 'best

available objective evidence' or meaningfully engage in an 'individualized assessment' of

whether [plaintiff] could perform the essential duties of his job safely—and that, as a result,

[defendant's] direct threat determination was not objectively reasonable." *Id.* at *4.

        The *West* facts differ significantly from the facts here. As already explained in detail,

this case's summary judgment facts establish that Dr. Holland provided a reasoned basis for the

medical guidance defendant applied to plaintiff's condition. It was evidence-based and

developed by other medical experts. Also, the reviewing physicians conducted an individualized

assessment of plaintiff's medical records and specifically considered the location of plaintiff's

intracerebral hemorrhage. Applying the FMCSA guidance to plaintiff's individualized medical

condition, the reviewing physicians determined it was reasonable to impose the five-year work

restrictions on plaintiff because of the risk for sudden incapacitation. And, other medical

opinions—such as the ones from Dr. Richardson and Dr. Rosenberg—don't conflict with this

_____

[13]        This is the same Dr. Holland who approved plaintiff's work restrictions in this case.

determination because those doctors weren't familiar with plaintiff's job duties and didn't review the essential functions of his job.  In short, this case's summary judgment facts simply differ from *West*'s summary judgment facts because there, the employer's decision lacked a medical basis and differed from another medical expert's opinions.[14]  Plaintiff's second argument can't create a triable issue of pretext.

   *Third*, plaintiff asserts that defendant "issued restrictions to its superintendents before its physicians even looked at [p]laintiff's medical records."  Doc. 63 at 15.  Plaintiff's argument on this front relies on the date plaintiff's supervisor wrote on the restriction review form.  HMS provided superintendent Kelli Dunn with plaintiff's restrictions and asked her whether defendant could accommodate plaintiff's restrictions on a form dated September 26, 2018.  Doc. 60-35 at 1–2 (Restriction Review Form).  Superintendent Dunn completed the form, noting that plaintiff's restrictions interfered with the essential functions of plaintiff's position and that defendant could not provide reasonable accommodation.  *Id.*  And, Superintendent Dunn dated the form August 28, 2018.  *Id.*  On September 28, 2018—two days after the date listed at the top of the review form—defendant's employee, Rebecca Patrick, emailed that defendant wasn't able to accommodate plaintiff's work restrictions.  Doc. 60-36 (September 28, 2018 email).

   No reasonable jury could infer pretext from the August 28, 2018 date that Superintendent Dunn wrote by hand on the form.  The summary judgment facts show that defendant created the restriction form on September 26 and made the decision that plaintiff was unable to perform the

---

[14]     Plaintiff also cites a Nebraska federal district court case involving defendant's FFD reviews to argue that defendant here didn't conduct an individualized review of plaintiff's medical condition.  Doc. 63 at 15 n.84 (citing *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 623 (D. Neb. 2019), *rev'd*, 953 F.3d 1030 (8th Cir. 2020)).  But the Eighth Circuit reversed the Nebraska district court's decision certifying a class of employees subject to FFD evaluations, agreeing with defendant that "the individualized inquiries in this case cannot be addressed in a manner consistent with Rule 23."  953 F.3d at 1035.  And, the Circuit explicitly noted that defendant's FFD review "process leads to varying—and individualized— outcomes."  *Id.* at 1037.  This case's certification analysis simply doesn't assist plaintiff's arguments here.

essential functions of his job on September 28—after defendant's physicians had reviewed plaintiff's medical records.  Other courts have held that an "obvious typographical error" like the one Superintendent Dunn made here "does not create a genuine issue of material fact" precluding summary judgment.  *Daub v. Eagle Test Sys., Inc.*, No. C-05-01055 RMW, 2006 WL 3782877, at *3 n.4 (N.D. Cal. Dec. 21, 2006) (noting that the year of a letter's date was an "obvious typographical" error and didn't preclude summary judgment); *see also M. Prusman Ltd. v. M/V Nathanel*, 684 F. Supp. 372, 374 (S.D.N.Y. 1988) (concluding that a typographical error in a surveyor's report didn't create a genuine issue of material fact when other portions of the report showed accurate information).  To say it simply, plaintiff hasn't furnished admissible evidence capable of supporting a reasonable finding or inference that Superintendent Dunn completed the form on August 28, 2018—as asserted by plaintiff.

*Last*, plaintiff asserts that his "medical records evidence [d]efendant's concern of seizure risk is unfounded."  Doc. 63 at 15.  Again, he cites Dr. Rosenberg's medical records finding that plaintiff's intracranial hemorrhage had resolved and Dr. Richardson's release for plaintiff to return to work.  Also, he cites his own testimony that he hasn't had a seizure or lost consciousness since his accident (and that he is capable of driving).  For reasons already explained in detail, this evidence can't create a jury question about pretext.  Instead, defendant has come forward with evidence establishing that plaintiff's head injury and the location of his intracerebral hemorrhage presented a risk of sudden incapacitation.  Likewise, defendant has adduced evidence that after it considered the essential functions of plaintiff's safety-critical job, defendant determined that the five-year restrictions were warranted for safety reasons.  Plaintiff hasn't produced submissible evidence capable of supporting a reasonable jury finding or inference that defendant's decision was pretext for discrimination.

For all these reasons, the summary judgment facts present no triable issue of pretext. Thus, even if plaintiff could establish a prima facie case of ADAAA discrimination, his claim also fails under the third step of the *McDonnell Douglas* burden shifting framework.

### B. ADAAA and FMLA retaliation

Both the ADAAA and FMLA prohibit employers from retaliating against employees who engage in an activity protected by the acts. *See* 42 U.S.C. § 12203(a)–(b) (ADAAA); *see also* 29 U.S.C. § 2615(a)(1)–(2) (FMLA). The *McDonnell Douglas* burden shifting analysis applies both to ADAAA and FMLA retaliation claims. *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 679 (10th Cir. 2021) (ADAAA retaliation); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (FMLA retaliation). As already discussed, this framework requires plaintiff to bear the initial burden of making a prima facie case for retaliation. *Herrmann*, 21 F.4th at 679; *Metzler*, 464 F.3d at 1170. A prima facie case of retaliation requires plaintiff to establish that: (1) plaintiff "engaged in a protected activity;" (2) defendant "took an action that a reasonable employee would have found materially adverse;" and (3) a causal connection exists "between the protected activity and the adverse action." *Metzler*, 464 F.3d at 1170; *see also Herrmann*, 21 F.4th at 679. If plaintiff satisfies the prima facie burden, the burden then shifts to the defendant to prove a legitimate, non-discriminatory reason for its adverse employment decision. *Herrmann*, 21 F.4th at 679; *Metzler*, 464 F.3d at 1170. And when the defendant meets that burden, plaintiff must show that defendant's proffered reason is pretext. *Herrmann*, 21 F.4th at 679; *Metzler*, 464 F.3d at 1170.

### 1. No Prima Facie Case of ADAAA Retaliation

Here, plaintiff's ADAAA retaliation claim fails because the summary judgment facts present no triable issue whether he engaged in protected activity under the ADAAA.

Defendant's opening summary judgment brief argues that notifying an employer of a disability isn't protected activity under the ADAAA. *See Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (affirming summary judgment against plaintiff's disability retaliation claim where employee had disclosed her medical condition to her employer, but hadn't "made a specific request for any accommodation," *i.e.*, hadn't engaged in protected activity, before adverse employment action). Plaintiff's Opposition never responds to this argument. Thus, plaintiff concedes that merely reporting his head injury to defendant wasn't protected activity under the ADAAA.

Instead, plaintiff responds that his filing of his charge of discrimination on June 6, 2019, constituted protected activity. Doc. 63 at 24. Defendant asserts that plaintiff didn't assert this theory in the Pretrial Order, and as a consequence, he can't assert it now. *See, e.g.*, *Gordon-Howell*, 232 F. Supp. 2d at 1255 n.5. Even so, plaintiff's charge of discrimination can't save his ADAAA retaliation claim. While plaintiff's right about his argument's legal premise—that the filing of a charge of discrimination is protected activity—he's wrong about the timeline. Plaintiff filed his charge in June 2019—months *after* defendant's decision in September 2018 to impose work restrictions on plaintiff and its conclusion that those work restrictions interfered with plaintiff's ability to perform the essential functions of his job and that it couldn't provide a reasonable accommodation for plaintiff.

The third step of a prima facie case of retaliation requires a "causal connection between a protected action and a subsequent adverse action" that "can be shown through evidence of circumstances that justify an inference of retaliatory motive, such as *protected conduct closely followed by adverse action*." *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011) (emphasis added) (citation and internal quotation marks omitted). "Obviously, no causal

connection exists if the adverse action occurred *before* plaintiff's protected activity." *Anderson v. United Parcel Serv., Inc.*, No. 09-2526-KHV, 2011 WL 4048795, at *14 (D. Kan. Sept. 13, 2011) (emphasis added). Thus, the summary judgment facts can't provide a reasonable jury a basis to find or infer a causal connection between plaintiff's protective activity and the alleged adverse action—one of the required elements of a prima facie case of ADAAA retaliation. For this reason, defendant deserves summary judgment against plaintiff's ADAAA retaliation claim.

### 2.   No Prima Facie Case of FMLA Retaliation

Plaintiff's FMLA claim fails for similar reasons. The summary judgment facts present no triable issue whether plaintiff engaged in protected activity under the FMLA. Plaintiff asserts that he "applied for FMLA-protected leave in July of 2018[.]" Doc. 63 at 24. But, the summary judgment facts don't support that assertion. It's undisputed that, on July 16, 2018, defendant provided notice to plaintiff of his rights and responsibilities under the FMLA. Doc. 60-21. Plaintiff explicitly testified that he doesn't recall submitting a request to take FMLA leave after his motorcycle accident. Doc. 60-2 at 30 (Pl.'s Dep. 118:3–24). And, although plaintiff testified that he "was granted FLMA[,]" he also testified that he can't remember if he applied for leave and he agreed that his reference to a grant of "FMLA" was referring to defendant granting him "medical leave." *Id.*

No reasonable jury could conclude from these summary judgment facts that plaintiff engaged in protected activity under the FMLA. *See, e.g.*, *Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 887 (D. Kan. 2007), *aff'd* 264 F. App'x 678 (10th Cir. 2008) (explaining that "case law and pertinent regulations make clear that in order for a plaintiff to 'avail' herself of the FMLA, she must fill out the appropriate paperwork and actually elect to take such leave" and granting summary judgment against FMLA retaliation claims because it was "undisputed that

plaintiff failed to do so"); *see also Flanagan v. ScriptPro, LLC*, No. 2:17-cv-02586-HLT, 2019 WL 1003403, at *8 (D. Kan. Feb. 28, 2019) (granting summary judgment against plaintiff's FMLA retaliation claim because plaintiff didn't submit "any evidence that he asserted his FMLA rights by submitting the requisite paperwork" and "an employer cannot be found to have retaliated unless they knew or should have known that the plaintiff had invoked his FMLA rights"). In sum, plaintiff can't shoulder his burden to establish a prima facie case of FMLA retaliation. For that reason, defendant deserves summary judgment against plaintiff's FMLA retaliation claim.

### 3. No Pretext for ADAAA or FMLA Retaliation

Even if plaintiff could present a triable issue of a prima facie case on his ADAAA and FMLA retaliation claims, both claims can't survive summary judgment for another and independent reason. The summary judgment facts present no jury question of pretext. Plaintiff's Opposition to the summary judgment motion asserts that his "arguments for pretext for his retaliation claims are substantially the same as those for his disability claims." Doc. 63 at 28. He again argues that defendant's FFD review was discriminatory and that plaintiff's treating physician (Dr. Richardson) cleared him to return to work. *Id.* at 28–29. As already discussed, these arguments don't present a triable issue of pretext to preclude summary judgment against plaintiff's ADAAA discrimination claim. These same arguments don't create a jury question whether defendant's decision to impose plaintiff's work restrictions that made him unable to perform the essential functions of his job was pretext for ADAAA or FMLA retaliation. So, for this second and independent reason, the court grants summary judgment against plaintiff's retaliation claims.

**IV.     Conclusion**

For reasons explained, the court grants defendant's Motion for Summary Judgment

against plaintiff's ADAAA discrimination and ADAAA and FMLA retaliation claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Union Pacific

Railroad Company's Motion for Summary Judgment (Doc. 59) is granted.  Consistent with this

Order, the court directs the Clerk to enter Judgment against plaintiff.

**IT IS SO ORDERED.**

**Dated this 3rd day of June, 2022, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**